COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia


JAMAR SAYVON CORDELL

                                                       MEMORANDUM OPINION[*] BY
v.          Record No. 0123-24-2            CHIEF JUDGE MARLA GRAFF DECKER
                                                            SEPTEMBER 2, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent Defense
Commission, on briefs), for appellant.

William K. Hamilton, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Jamar Sayvon Cordell appeals his conviction, rendered by a jury, of robbery with a

firearm in violation of Code § 18.2-58.[1]  Cordell contends that the trial court erred by permitting

the Commonwealth to impeach a defense witness with extrinsic evidence of a prior inconsistent

statement.  He further argues that it erroneously excluded his own testimony about being

stabbed, which he suggests would have explained why his testimony at trial differed from his

initial statement to police.  We hold the trial court did not commit reversible error.  Accordingly,

we affirm the conviction and remand solely for the correction of a clerical error in the conviction

order.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Commonwealth's theory of the case was that Cordell acted as a principal in the
second degree.  *See generally* Code § 18.2-18 (providing, subject to a narrow exception, that
"every principal in the second degree . . . may be indicted, tried, convicted and punished in all
respects as if a principal in the first degree").

On the evening of April 12, 2023, Otto Vidal noticed an SUV driving "aggressively," narrowly avoiding a collision with his car. Vidal flashed his headlights at the SUV, and at the next traffic light, he used his cell phone to photograph its rear license plate. In response, Cordell, the driver of the SUV, approached Vidal's car on foot while the traffic light was red, asked why he took the photo, and pointed a firearm at Vidal's face.

Seconds later, as Vidal offered to delete the photograph, one of Cordell's passengers, Larry Craig, Jr., ran up and stood beside Cordell at the driver's window. Craig pointed a second firearm at Vidal. While both men had their firearms trained on him, Craig grabbed Vidal's cell phone. Cordell and Craig then ran back to the SUV together. As Craig got into the passenger side of the car, Cordell got back into the driver's seat and drove away. Marvin Carpio, a bystander, saw the encounter from about twenty feet away. He confirmed that two men approached the car and each pointed a gun at the driver.[3]

Vidal stopped to call police and provided the SUV's license plate number. About an hour later, at the address where the SUV was registered, police found Cordell and Craig, as well as two other men and a woman, in and around the car. Vidal identified Cordell and Craig as his assailants.

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Ray v. Commonwealth*, 74 Va. App. 291, 307 (2022) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original)).

[3] Carpio explained that he was acquainted with Vidal but did not know who the victim was at the time of the offense. He admitted at trial that he told someone from Cordell's defense team prior to trial that he "didn't see anything." He said he did so because he had been told that he did not have to talk to anyone other than the investigating officers.

Cordell's gun was found on the front passenger floorboard of the SUV.[4] In the pocket attached to the rear of the front passenger seat, accessible to Craig from where he sat in the back seat when first approached by law enforcement, police found another firearm and Vidal's cell phone. Rashik Cousins was with the group when Cordell and Craig were arrested. Police determined that he was also in the SUV at the time of Vidal's robbery, along with a fourth person, Cordell's fiancée.

Cordell and Craig were charged with robbing Vidal. Vidal and Carpio testified in the Commonwealth's case-in-chief at Cordell's trial, and Vidal again identified Cordell as the first of the two assailants to arrive at his car.[5] Cordell subpoenaed Craig, who invoked his Fifth Amendment right against self-incrimination, and the trial court declared him unavailable as a witness.

Cousins, admittedly a close friend of Cordell, testified for the defense at trial. Cousins was in the back passenger seat behind Cordell and next to Craig. He remained in the SUV during the traffic-light encounter with Vidal. Cordell was wearing a firearm in a holster when he approached Vidal, but according to Cousins, Cordell did not remove the weapon and did not rob Vidal. Cousins testified that only Craig drew a weapon and pointed it at Vidal's head. He further claimed that Cordell was already walking back to the SUV and telling Craig to "come on" when Craig drew his weapon and took Vidal's phone. Cousins, however, admitted that he wanted to "protect" Cordell. And he made arguably inconsistent statements about how he could have seen and heard everything that happened while Cordell and Craig were at Vidal's car. Finally, Cousins acknowledged that he had at least four prior convictions for crimes involving lying, cheating, or stealing.

---

[4] Cordell admitted at trial that the gun was his.

[5] Carpio described the men by gender, race, and approximate age, and testified that both men pointed guns at the driver. He did not specifically identify either of them.

Cordell testified to the same general version of events as Cousins. He denied holding a gun to Vidal's head and suggested that Vidal must simply have been mistaken about the presence of two guns. He further said he returned to the SUV before Craig, did not see Craig point a gun at Vidal or take his cell phone, and learned about the robbery only after they drove away. Cordell admitted he had provided different information about what happened when he spoke to the police at the time of his arrest, denying both that a robbery had taken place and that Craig was involved.

On rebuttal, the Commonwealth called the detective who interviewed Cordell's fiancée a few days after the robbery. He testified that she provided an account similar to Cordell's at that time except that she "implicate[d] . . . Craig" and did not respond to his effort to follow up.

At the close of all the evidence, the jury found Cordell guilty of robbery with a firearm. He was sentenced to five years of incarceration with one year suspended.

ANALYSIS

Cordell challenges two of the trial court's evidentiary rulings. "When reviewing a trial court's decision to admit or exclude evidence, [appellate courts] apply an abuse of discretion standard. In this context, 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Bista v. Commonwealth*, ___Va. ___, ___ (Nov. 14, 2024) (citation omitted) (quoting *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)). The "bell-shaped curve of reasonability" underpinning appellate review for an abuse of discretion "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that [it] does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127

(2021) (first alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 16, 2025) (quoting *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016)).

Cordell contends first that the trial court erred by admitting testimony about alleged prior inconsistent statements of his witness—Rashik Cousins. Second, he argues that the court erroneously excluded his own testimony that he was stabbed in jail by people calling him a snitch. We consider each challenge in turn.

## I. Admission of Cousins's Prior Inconsistent Statements

### A. Cousins's Prior Statements and Trial Testimony

When Cousins was cross-examined, he admitted talking to Cordell's primary defense counsel before trial and said he told him about the same events to which he testified at trial.[6] When Cousins's testimony concluded, the trial court told him to "remain outside until . . . release[d]."

Defense witness John Russell, an investigator working with Cordell's two defense attorneys, testified next and used a sheet of notes to refresh his recollection. The prosecutor was allowed to view the sheet, which was drafted as a memo from Russell to the defense attorneys and dated the day before trial. It included a summary of a pretrial interview with Cousins, which occurred one week before trial. The memo specified that Russell and primary defense counsel were present for that interview.

After reviewing the memo, the prosecutor tried to question Russell about an allegedly prior inconsistent statement Cousins made that was included in the memo. Defense counsel objected and

---

[6] Cordell was represented by two attorneys who shared defense duties at trial. Only one of those attorneys, however, was directly involved in the proceedings relating to the admission of the prior inconsistent statements. All mentions in this section of primary defense counsel, defense counsel, defense attorney, or other similar nomenclature in the singular refer to that same lawyer. Cordell is represented by a different attorney on appeal.

contended that the prosecutor first had to confront Cousins, not Russell, with the statement. The prosecutor argued that due to the failure of defense counsel to turn over the pretrial statement as soon as Cousins gave inconsistent testimony, she was unable to cross-examine Cousins about it because he was no longer on the witness stand. She elaborated that Russell, the witness then on the stand, was the witness through whom she needed to offer Cousins's inconsistent statements. The court allowed her to proceed.

The prosecutor elicited testimony from Russell about three statements that Cousins made when he met with Russell and primary defense counsel a week earlier. She accurately represented that Cousins had not specifically testified to those things.[7]

### B. Admission of Prior Inconsistent Statements

"[T]he credibility of a witness may be impeached by any party other than the one calling the witness, with any proof that is relevant to the witness's credibility." Va. R. Evid. 2:607(a). The trial court may admit prior inconsistent statements that are "probative on the issue of credibility . . . to convince the trier of fact that the witness's perception, memory, or narration is defective or impaired, or that the sincerity or veracity of the witness is questionable." Va. Rs. Evid. 2:607(a)(vi), (viii), 2:613. Ordinarily, a witness must "'first [be] given an opportunity to explain or deny' a prior inconsistent oral statement before extrinsic evidence of such statement can be admitted." *Warnick v. Commonwealth*, 72 Va. App. 251, 266 (2020) (alteration in original) (quoting Va. R. Evid. 2:613(a)(ii)). And extrinsic evidence of a prior inconsistent statement is generally admissible "only . . . if the witness 'denies or does not remember [making] the prior inconsistent statement.'" *Id.*

---

[7] Even so, Cousins had not directly contradicted those statements while testifying. Virginia law permits using even a statement that shows an arguable, rather than clear-cut, inconsistency as a prior inconsistent statement for impeachment. *See Jones v. Commonwealth*, 50 Va. App. 437, 447 (2007) (holding that failing to assert a fact when it would have been natural to do so qualifies as a prior inconsistent statement permitting impeachment). Cordell did not contend below and does not suggest on appeal that the statements at issue do not meet this standard.

- 6 -

(quoting Va. R. Evid. 2:613(a)); *see* Va. R. Evid. 2:613(a)(ii) (granting a trial court the discretion to admit extrinsic evidence of a prior oral statement without providing this opportunity to the witness if "the interests of justice otherwise require").

Cordell emphasizes that the prosecutor failed to cross-examine Cousins about his statements to Russell and primary defense counsel. He argues that, as a result, the Commonwealth did not establish the foundation necessary to admit the alleged prior inconsistent statements of Cousins through Russell. Cordell concludes that the trial court therefore erred by allowing Russell to testify about statements that Cousins had not been asked to confirm or deny. In the context of these unique facts, we disagree.

We hold that the decision of the Supreme Court of Virginia in *Jefferson v. Commonwealth*, 214 Va. 432 (1974) (per curiam), is instructive in determining the proper foundation for admissibility here. *Jefferson* involved a marijuana distribution conviction. *Id.* The Commonwealth's evidence was that the defendant handed a bag of marijuana to his companion, who then handed the bag to the buyer. *Id.* at 433. The alleged buyer, a defense witness, testified and claimed that he had received the drugs from a different person on an earlier day. *Id.* The buyer further testified that he told police after his arrest that neither the defendant nor his companion "had [any]thing to do with the marijuana." *Id.* And he named the two police officers to whom he made this statement. *Id.* On rebuttal, over the defendant's objection, one of those officers testified that the buyer previously said only that the defendant's companion, not the defendant, "had nothing to do with the marijuana." *Id.*

The defendant in *Jefferson* contended that the trial court erred by allowing the police officer to testify about the buyer's prior inconsistent statement without a "proper foundation." *Id.* The Court held that "no such foundation is required" where the witness to be impeached has acknowledged making the prior statement and testified about its contents. *Id.* Once this takes place,

- 7 -

the only "question [remaining i]s what [the witness] had stated." *Id.* On these facts, the Supreme Court held that "[t]he trial court correctly ruled that one of the [people to whom the statement was made] could testify in rebuttal that the statement was different from the version to which [the witness] testified." *Id.*; *see also* Kent Sinclair, *The Law of Evidence in Virginia* § 12-3[c][3] (8th ed. 2024) (citing *Jefferson* as an example of a case in which "[n]o foundation is required" for the admission of a prior inconsistent statement).[8]

Similarly in the instant case, Cousins testified about what happened when Cordell and Craig approached Vidal's car, returned to Cordell's SUV, and drove away. On cross-examination, Cousins elaborated that he spoke to Cordell's primary defense counsel prior to trial about what happened and confirmed that the attorney "knew th[e] story" about which Cousins testified on direct. As in *Jefferson*, this was all that was required to provide the necessary foundation for the challenged testimony concerning what Cousins told defense counsel about the robbery before trial. *See Jefferson*, 214 Va. at 433.[9]

---

[8] In *Jefferson*, 214 Va. at 433, the Court explained that the witness "identified the time and place when he made the statement and the [people] to whom he made it." The omission of one or more of these elements is generally not dispositive as long as the witness has adequate notice of the circumstances. *See* Va. R. Evid. 2:613(a)(i) (referencing "circumstances . . . sufficient to designate the particular occasion" (citing Code § 8.01-403)); Sinclair, *supra*, § 12-3[[c][1] (referencing "adequate[] warn[ing] of the thrust of the inquiry and . . . which occasion is being referred to"). Here, Cousins acknowledged that he talked to primary defense counsel about the robbery in the month prior to trial. A more specific identification of time and place was not required. *See Bloom v. Commonwealth*, 262 Va. 814, 821 (2001) (observing that a trial court's ruling admitting evidence encompasses any necessary subsidiary factual findings, which are made by a preponderance of the evidence, and that those findings are entitled to deference on appeal), *cited with approval in Harris v. Joplin*, ___ Va. ___, ___ (June 12, 2025).

[9] In *Jefferson*, 214 Va. at 433, the defense witness to be impeached testified on direct examination rather than cross-examination that he spoke to police about what happened. We view this distinction as lacking legal significance as long as the witness admits making the prior statement before the impeachment occurs. Also lacking legal significance for purposes of the evidentiary foundation is that Cousins testified he talked only to defense counsel and not to anyone else who worked with him. Cousins admitted talking to the specific defense attorney,

Under these circumstances, we hold that the trial court did not abuse its discretion by admitting the extrinsic evidence of Cousins's pretrial statements.[10]

## II. Exclusion of Cordell's Testimony about the Alleged Jail Stabbing

### A. Cordell's Proffered Testimony

Cordell testified extensively on cross-examination about why he did not tell the police before trial that Craig was the perpetrator. He suggested that he did not do so immediately after the robbery because he "didn't have a cell phone on [him]," lacked "privacy," and "didn't want to . . . make it obvious." He elaborated that he feared retaliation against him and his family and "would rather have a lawyer . . . work [it] out" at trial. Despite these stated concerns, according to Cordell, while he was incarcerated with Craig after their arrests, he told Craig that he planned to testify against him. He reported that Craig did not respond "with peace" at that time.

On redirect examination, defense counsel again asked Cordell why he did not tell the detective who interviewed him immediately after the crime that Craig took Vidal's phone. Cordell reiterated that it was a "safety precaution" because he was "a little concerned" about what Craig might do. When defense counsel asked if Craig had "given [him] a reason" to be concerned, the prosecutor objected. Outside the jury's presence, defense counsel proffered Cordell would testify that he was stabbed during pretrial detention, about six weeks before trial, and that the perpetrators, whom Cordell had seen talking to Craig, called Cordell a "snitch." According to counsel, Cordell would also testify that no one else in their jail unit knew anything

---

and the statement at issue was made to him, albeit, according to Russell, in Russell's presence. *See Bloom*, 262 Va. at 821 (noting the deferential standard of review applicable to a trial court's findings of fact underpinning an admissibility ruling).

[10] In light of our holding, we do not address the Commonwealth's argument that any error was harmless. *See generally Blackman v. Commonwealth*, 45 Va. App. 633, 639 n.1 (2005) (noting that the affirmance of the appeal on the merits rendered analysis of the Commonwealth's harmless-error argument unnecessary).

about Cordell's plan to "talk[] to [the] police."  Counsel proffered a photograph of a scar and an additional photo of a metal object that he represented was used to stab Cordell.  Counsel further proffered a medical record that showed Cordell received medical treatment at the jail's infirmary during that time frame but did not reflect that Cordell reported a stabbing or anything else that corroborated his account.  The Commonwealth argued that the proffered information was both impermissible character evidence and double hearsay.

The trial court sustained the Commonwealth's objection, refusing to admit the proffered testimony.  It stated that the evidence was "too attenuated" and its "prejudicial value outweigh[ed its] probative value."  And it ruled that the evidence was "hearsay without exception."

## B.  Exclusion of Cordell's Testimony About the Stabbing

Cordell contends that the trial court erred by excluding his testimony that he was stabbed by two inmates who called him a snitch.  He explained below that he told Craig he planned to implicate Craig as the robber when he testified at his own trial.  He argued that the inmates who stabbed him must have learned of his plans from Craig and stabbed him to deter him from doing so.  Cordell claims that the attack proved his fear of Craig was justified and helped explain why he did not tell police prior to trial that it was Craig who held a gun to Vidal's head and took his phone.  Cordell suggests that, because this testimony was excluded, he is entitled to a new trial.

Appellate courts are required to decide cases on "the best and narrowest ground available." *See Holland*, ___ Va. at ___ (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). And harmless error review "is statutorily required [by Code § 8.01-678] . . . 'in *all* cases'" in which error has occurred.  *Welsh v. Commonwealth*, ___ Va. ___, ___ (Mar. 20, 2025) (quoting *Commonwealth v. Swann*, 290 Va. 194, 200 (2015)).  As a result, this Court will not assess the merits of the challenged evidentiary ruling.  Instead, we assume without deciding that error occurred

because we conclude that "the best and narrowest ground[]" for decision here is that the alleged trial court error, if error at all, was harmless as a matter of law. *See Davis v. Commonwealth*, 79 Va. App. 123, 146 (2023) (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 258 n.2 (2019)).

For an appellant "to be entitled to relief" based on trial court error, "he must demonstrate that the error was significant enough to merit reversal." *Welsh*, ___ Va. at ___. When the claimed error is an "evidentiary ruling" not implicating constitutional concerns, the appellate court "review[s] the matter under the . . . standard" for nonconstitutional harmless error. *Shaw v. Commonwealth*, ___ Va. ___, ___ (Apr. 17, 2025); *see Commonwealth v. Paxton*, ___ Va. ___, ___ (May 29, 2025) (recognizing that the standard of review applicable to evidentiary error can be constitutional or nonconstitutional). That is the applicable standard in this case because the alleged error is purely a ruling on the admissibility of evidence.

A nonconstitutional error is harmless if the reviewing court "can conclude 'that the error did not influence the jury[] or had but slight effect.' . . . To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the [outcome]." *Commonwealth v. Kilpatrick*, 301 Va. 214, 216-17 (2022) (first alteration in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)); *see Paxton*, ___ Va. at ___.

But harmless error analysis is not readily "amenable to . . . hard and fast rules." *Welsh*, ___ Va. at ___ (quoting *Saal v. Commonwealth*, 72 Va. App. 413, 425 n.6 (2020)). To the contrary, it involves "[s]tandards"—"subjective criteria about which reasonable minds can, and do, differ. . . . Accordingly, it is difficult if not impossible to detail a list of objective criteria to guide harmless error review in all cases." *Id.* at ___ (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009)).

In general terms, when the issue involves the improper exclusion of evidence, harmless error analysis requires the appellate court to "consider[] the *potential* effect of the excluded evidence in

light of all the evidence that was presented to the jury." *Haas v. Commonwealth*, 299 Va. 465, 467 (2021) (emphasis added) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)). More specifically, we "consider the totality of the proffer," *Shaw*, ___ Va. at ___, and whether the excluded evidence was "merely cumulative" of other evidence presented to the jury, *see Smith v. Commonwealth*, 72 Va. App. 523, 545 (2020) (quoting *King v. Cooley*, 274 Va. 374, 380 (2007)). Further, the reviewing court considers "any apparent inconsistencies in [the witness's] testimony[] and any other factors that might affect h[is] credibility before the jury." *Shaw*, ___ Va. at ___. Finally, we must "place [the excluded] testimony into the context of the [entire] trial." *Id.* at ___.

Harmless error review, therefore, "effectively requires [the] appellate court to do what it normally does not do—engage in . . . hypothetical 'fact' finding." *Welsh*, ___ Va. at ___; *see Shaw*, ___ Va. at ___. Such review does not consider merely "whether the evidence absent the error was sufficient for conviction, whether the members of th[e reviewing appellate c]ourt would have convicted absent the error, or even whether the defendant clearly is guilty in fact." *Shaw*, ___ Va. at ___. Instead, this Court "must be able to conclude that if the error had not occurred, the jury still would have convicted the defendant." *Id.* at ___ (citing *Kotteakos v. United States*, 328 Va. 750, 764 (1946)).

Upon our review of the record, we conclude that any error in excluding the proffered testimony regarding the stabbing was harmless. This is so because the jury "would have convicted" Cordell even if the evidence of the stabbing had been admitted. *See id.* We base this conclusion on the minor importance of the proffered testimony to Cordell's defense in light of its cumulative nature, factors affecting Cordell's credibility, and the evidence of Cordell's guilt in the context of the record as a whole.

Here, the proffer made clear that the excluded testimony was a relatively minor part of Cordell's theory of the case. Defense counsel proffered Cordell would testify that about six weeks

before trial, after he told Craig he planned to testify against him, two other inmates stabbed Cordell and called him a snitch. Cordell would further testify that he had seen his attackers talking to Craig and, in addition, that his plan to testify against Craig, which he shared only with Craig, provided the sole plausible explanation for their calling him a snitch. That testimony, however, if believed by the jury, would have had limited relevance in context. It would have explained his failure to report Craig's actions to the police for only a relatively small portion of the time during which he failed to implicate Craig—from August 2, the date of the alleged jail stabbing, until trial started on September 12, a period of about six weeks. Other than serving as after-the-fact ratification of his claim of fear, about which he had already testified, it had no *direct* relevance to his failure to report Craig's actions to police prior to that—from the date of the robbery on April 12 to the date of the alleged stabbing on August 2, a period of about sixteen weeks. Plus the proffer left a number of questions for the jury, requiring speculation to tie the stabbing and snitch reference in a jail setting to Cordell's association with Craig and the charged crime.

More importantly, the excluded testimony was cumulative. Before Cordell attempted to offer it, he had already testified extensively about his fear of Craig as a basis for not telling the police about Craig's commission of the armed robbery. *See Proffitt*, 292 Va. at 640-41 ("Cumulative testimony is repetitive testimony that restates what has been said already and adds nothing to it. It [must be] of the same kind and character . . . ." (quoting *Massey v. Commonwealth*, 230 Va. 436, 442 (1985))). Cordell testified that he was concerned that Craig, who lived very close to him, would retaliate against him and his family. This evidence was squarely before the jury. And the excluded testimony would also have come directly from Cordell, requiring the same credibility assessment by the jury.

Cordell disputes the rationale that the exclusion was rendered harmless by his testimony that "he refrained from telling the police about Craig's actions out of fear for his own safety." He

suggests that his excluded testimony about an actual "stabbing would have established the reasonableness of [his] fear" and proved that he "was not grasping for an after[-]the[-]fact justification." Notably, however, the excluded testimony about the alleged stabbing was just that—testimony. Cordell's assignment of error does not suggest that the trial court erred by excluding the photos of his scar or the weapon allegedly used to inflict it. Nor does he challenge the exclusion of the jail medical records, which counsel admitted did not indicate why Cordell sought medical attention. We consider only the issue framed in the assignment of error. *See* Rule 5A:20(c)-(c)(1). Logically, then, the impact of Cordell's testimony about the alleged stabbing would have depended on the jury's assessment of his credibility in the same way that the impact of his testimony about his more general fear of Craig depended on his credibility. And if the jury had accepted Cordell's testimony about the stabbing, any added value from it would have been slight due to his prior testimony that he did not make an earlier report to police that Craig was the robber because he was afraid of Craig, whether that fear *later* proved to be well-founded or not.

Next, it is important to consider Cordell's credibility in context. Numerous factors adversely impacted the jurors' overall assessment of Cordell's credibility, making them less likely to accept the proffered testimony as true. First, he had an obvious motive to exculpate himself as a participant in the robbery. Second, the Commonwealth brought out inconsistencies in his testimony at trial. Cordell testified that the first thing he did when he walked back to Vidal's stopped car was to ask Vidal if he was okay. But he could not explain why Cousins, his good friend who claimed to have overheard Cordell's entire conversation with Vidal, did not testify that he made such an inquiry. Cordell also testified that he merely *asked* Vidal to delete the photos of his SUV, but he admitted that he told the police that he *directed* Vidal to do so. Cordell thus made plain to the jury that he was willing to slant the truth for personal benefit.

Finally, we view the excluded stabbing and snitch testimony in the context of the entire trial. The key parts of Cordell's admitted testimony, of course, were directly at odds with that of Vidal, the victim. The only evidence tending to corroborate Cordell's version of those key events was Cousins's testimony. Cousins, however, had multiple prior convictions impacting his own credibility, admitted that Cordell was like a brother to him, and gave conflicting testimony about how he could see and hear what transpired at Vidal's car from his location inside Cordell's SUV.

Vidal, unlike Cordell and Cousins, was not impeached in any material way. Vidal's report about how the robbery occurred did not change. He identified the SUV by its license plate number and consistently reported that two men got out of it at a traffic light and held guns on him. Vidal also consistently reported that while both men pointed their guns at his head, the second man, Craig, took his phone and the two men then ran back to the SUV "together."[11] Confirming Vidal's report regarding the license plate of the automobile in which his assailants fled, his cell phone was found in one of the SUV's seat pockets. Further, as Cordell admitted at trial, Vidal accurately identified him and Craig as the two men who approached his car when the police had him view three men, successively in show-up format, after they were found with the SUV about an hour after the robbery.

Vidal also accurately described Cordell's gun and identified the firearm at trial. The gun had "an extended clip" that "st[u]ck out" when inserted into the firearm and made it too big to fit in Cordell's pants pocket. As Vidal reported both on the night of the robbery and at trial, Cordell pointed the gun directly at him, which explained how Vidal was able to identify the weapon at Cordell's trial. Vidal's statements and testimony about all other material details of the crime,

---

[11] Any minor discrepancies in his testimony, such as regarding the color and body style of Cordell's automobile (for which Vidal correctly provided the license plate number) and the heights and hairstyles of his assailants, were not material. *See generally* Va. R. Evid. 2:607(a)(viii) (addressing impeachment of a witness by challenging his perception, memory, narration, sincerity, or veracity).

therefore, proved true. So the jury logically also credited his testimony that Cordell and Craig stood together, with both of their firearms trained on him, when Craig took his phone.

Cordell initially claimed, at the time of his apprehension, that he did not point a firearm at Vidal and that Craig was not involved at all. He claimed at trial, as Cousins also testified, that Craig alone had a gun and took Vidal's phone, doing so only after Cordell started walking back to his SUV. Vidal's consistent version of events, however, contradicted both Cordell's inconsistent versions and Cousins's account, provided for the first time at trial. And Carpio—who was merely acquainted with Vidal and was not shown to be biased for or against any of those involved—testified and confirmed that he saw two men, not one, hold guns on a driver. Carpio's testimony was consistent with Vidal's and inconsistent with Cordell's and Cousins's. Finally, Cordell admitted that he did not know Vidal before the robbery and had no reason to believe that Vidal would lie about whether he pointed a gun at him.

"'A defendant is entitled to a fair trial but not a perfect one[]' . . . ." *Becker v. Commonwealth*, 64 Va. App. 481, 496-97 (2015) (quoting *Brown v. United States*, 411 U.S. 223, 231 (1973)); *see Proffitt*, 292 Va. at 641. The evidence, viewed in its entirety, establishes that the jury would have convicted Cordell of robbery as a principal in the second degree even if he had been permitted to testify that he was stabbed in jail after he told Craig that he planned to implicate him at trial. On this record, we conclude that if the trial court erred by excluding the challenged testimony, Cordell "had a fair trial on the merits and substantial justice has been reached." *See Shaw*, ___ Va. at ___ (quoting Code § 8.01-678). Any error would have been harmless.

CONCLUSION

We hold that the trial court did not err by permitting the Commonwealth to impeach a defense witness with extrinsic evidence of prior inconsistent statements. The Court also concludes that any error from the trial court's ruling refusing to admit Cordell's testimony about

- 16 -

being stabbed in jail was harmless. Accordingly, the trial court's judgment is affirmed, and the

case is remanded to the trial court for the correction of a clerical error in the conviction order.[12]

*Affirmed and remanded.*

---

[12] The conviction order purportedly quotes the jury as "fix[ing Cordell's] punishment at confinement in the Virginia Department of Corrections for three (3) years." The parties and the court agreed at the sentencing hearing, however, that the signed verdict form itself reflects that the jury "fix[ed] the defendant's punishment at . . . [c]onfinement in a state correctional facility [for] __5__ years." Consistent with the verdict form rather than the conviction order, the trial court sentenced Cordell to five years in prison. The court also granted the Commonwealth's motion to enter a corrected conviction order nunc pro tunc. It appears, however, that the corrected order was never entered. We therefore remand to the trial court to enter a corrected conviction order. *See* Code § 8.01-428(B); *Stevens v. Commonwealth*, 72 Va. App. 546, 560 n.5 (2020); *Young v. Commonwealth*, 70 Va. App. 646, 667 (2019).